In re MULBERRY CORPORATION, Wingate Land Corporation Mulberry Phosphates, Inc., Nu–Gulf Industries, Inc., Piney Point Phosphates, Inc., Debtors.

No. 01–2002–8P1 through 01–2006–8P1.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

March 9, 2001.

Don M. Stichter, Stichter, Riedel, Blain & Prosser, Tampa, FL, for Debtors.

## ORDER ON MOTION TO USE CASH COLLATERAL

ALEXANDER L. PASKAY,
Bankruptcy Judge.

These are non-consolidated Chapter 11 cases, filed by Mulberry Corporation (Mulberry Corp.), Wingate Land Corporation (Wingate), Mulberry Phosphate, Inc. (Mulberry Phosphate), Nu–Gulf Industries, Inc. (Nu–Gulf) and Piney Point Phosphates, Inc. (Piney Point)(collectively referred to as Debtors). The immediate matters under consideration are Emergency Motions for Order Authorizing the Use of Cash Collateral and Granting Adequate Protection, filed by each of the five Debtors. The Motions which were filed on February 15th 2001 were promptly scheduled for hearing on short notice for February 20th 2001. Although no formal written objections were interposed to the Motions, this Court heard argument of counsel for Credit Agricole Indosuez (Agricole) and counsel for CIT Group, Equipment Financing, Inc., Transamerica (CIT) in opposition to the Motions. Based on the arguments advanced and the relevant portion of the record, this Court now finds and concludes as follows:

The Debtors filed their respective Petitions for Relief on February 8, 2001. It appears that Mulberry Corp. is the parent and the other Debtors are wholly owned subsidiaries of Mulberry Corp. It is without dispute that Nu–Gulf is the owner of a phosphate mine which is currently not in operation. Wingate is the owner of an undeveloped 4,000–acre tract of land adjacent to the Nu–Gulf property which is supposed to contain substantial phosphate deposits.

Mulberry Phosphate consists of three operations, a sulfuric acid plant, a chemical plant and also a co-generation electric plant located in Polk County, Florida. Piney Point also has in the past been an operating chemical plant located in Manatee County, Florida. It appears that Agricole who holds the first mortgage on the real property owned by Wingate, Nu–Gulf and Piney Point, commenced a foreclosure action of its mortgages but only on the property of Nu–Gulf and Wingate. In connection with its foreclosure suit it obtained appointment of a receiver who is currently in control of the assets of Nu–Gulf and Wingate. It further appears that the State of Florida Department of Environmental Protection (FDEP) is seeking

the appointment of a receiver for Mulberry Phosphates and Piney Point. None of the subsidiaries of Mulberry Corp. generate any income, have no active payroll and the cost of receivership in the foreclosure action is borne by the mortgagees. The cost of preserving and maintaining the chemical plants without causing any environmental problems is currently borne by the FDEP and the EPA.

Prior to the commencement of this case, the same Debtors also sought relief in this Court under Chapter 11 approximately 10 years ago. Although this Court confirmed their Plan or Reorganization, they were constantly plagued with a multitude of problems. These problems were partially due to a depressed phosphate fertilizer industry, but also were due to environmental problems connected with the operation of Piney Point and Mulberry Phosphate. The production of fertilizer in these plants involves maintaining storage and shipping facilities and a phosphogypsum stack system for disposal of the highly toxic waste material generated by the manufacturing process.

The mining operation was quite limited and Nu–Gulf has only conducted active mining for 16 months in the past eight years. The mining operation consists of the excavation of phosphate ore from the ground by use of flooding and extraction by barge mounted dredges. Wingate never had any active operation but, as noted earlier, is the owner of a fee simple interest in an approximately 4,000–acre tract of land adjacent to the Nu–Gulf mine which contains phosphate ore reserves which are leased to Nu–Gulf. Mulberry Phosphate and Piney Point's entire operations depend on the phosphate rock mined by Nu–Gulf, which after being processed into fertilizer are sold commercially.

The assets of Nu–Gulf include stocks of merchantable low-grade already mined phosphate rock, the basic ingredient used to manufacture dimmonium phosphate fertilizer (DAP). Currently, Nu–Gulf has approximately 75,000 tons of phosphate rock available for sale which will produce approximately $1.5 million, out of which they have already received $90,000.00. Neither Mulberry Phosphate nor Piney Point are conducting operations at this point and has no need currently for the phosphate rock mined by Nu–Gulf.

The principal creditors who have an interest in the phosphate rock which the Debtors are attempting to sell are Agricole and CIT. Agricole is an agent for a lending group composed of itself and CoBank who hold the first mortgages on the plants and the underlying real estate of Nu–Gulf, Wingate, Piney Point and Mulberry Phosphate, but does not hold a first mortgage on the sulfuric acid plant and the cogeneration electric plant at Mulberry Phosphates. The balance owed to Agricole is approximately $35 million. CIT Group, one of whose participants is TransAmerica Financial, claims a lien junior to the lien of Agricole on all except the sulfuric acid plant and the cogeneration electric plant at Mulberry Phosphate. In addition, according to the Motion filed, the United States Environmental Protection Agency (EPA) may also have an interest in the phosphate rocks by virtue of monies expended by the Agency for environmental protection.

In support of their respective Motions, the Debtors contend that in order to maintain the economic integrity and viability of the five Debtor entities, it is absolutely essential to take care of the environmental problems which require expending funds to maintain and preserve Mulberry Phosphate and Piney Point, who have in the past contaminated the aquifer and the Alafia River. Further, it is essential to maintain the gypsum stack in full compliance

with all regulations promulgated by the FDEP.

It should be noted at the outset that the cash collateral may not be cash collateral in the conventional sense but, in fact, it is the proceeds of a proposed sale of the phosphate rock of Nu–Gulf. It is equally clear that if the sale is approved and the Debtors receive the proceeds of the sale, they do not intend to use the funds to be applied to the mortgage obligation and for the benefit of the collateral of the mortgagees, but solely for the purpose of preserving an environmentally sound caretaking operation of the two chemical plants.

Since Agricole's main concern in this matter is preserving the value of its collateral involved in the foreclosure actions currently pending against Wingate and Nu–Gulf, it is understandable that Agricole is opposed to the Motions. The bottom line is, Agricole does not want its collateral to be used up to pay for something it doesn't care about, i.e., the maintenance of Mulberry Phosphate and Piney Point.

In opposing the Motions to use Cash Collateral, Agricole contends that this is not really a question of use of cash collateral, but a sale out of the ordinary course of business, bypassing the requirements of Section 363(f) of the Bankruptcy Code. This Section provides that the Debtor may sell property of the estate free and clear of any interest in such property, but only under certain specified conditions. In addition, Agricole contends that even if one accepts the proposition that what is involved is the use of cash collateral, the Debtor is not offering, nor can it offer any adequate protection. Therefore, this Court should not grant the Motions of the Debtors.

In response the Debtors concede that the Debtors are not able to furnish adequate protection by periodic cash payments pursuant to Section 361(1) or an additional or replacement lien pursuant to Section 361(2). However, the Debtor's contend that they are granting to Agricole, and other parties who have a lien on the properties of Nu–Gulf and Wingate, protection which will result in the realization by these secured creditors of the indubitable equivalent of their interest in the real estate holdings of these two entities. Thus, this will be a satisfactory adequate protection in accordance with Section 361(3). According to the Debtors, this indubitable equivalent is the preservation of the value of these totally integrated operations which will preserve the going-concern value of Mulberry Phosphates and Piney Point, which cannot operate without using the properties of Wingate or Nu–Gulf. The Debtors also contend that the use of the cash to be obtained from the proposed sale of the rocks would also enhance the values of Wingate and Nu–Gulf as indispensable components of a totally integrated operation of these Debtors. Obviously this indubitable equivalent is nonquantifiable and not readily translatable to precise economic benefit.

It is equally obvious that once the phosphate rocks which are currently offered for sale are sold and the proceeds from the sale are used and consumed for the purpose of preserving the two chemical plants it would deprive the mortgage holders on the real estate of part of their collateral which can no longer be recouped and replaced.

It is clear and there is not much doubt that currently the State and the Federal Agencies in charge of enforcing environmental protection regulations clearly intend to insist on full compliance with the appropriate regulations, and compliance is an absolute must. Neither the Mulberry Phosphate nor Piney Point have any funds or are able to generate any income from which these expenses could be funded.

It is the contention of the Debtors that it is absolutely crucial to obtain the funds from the sale of the phosphate rocks because the alternative is an inescapable closure of the chemical operations and revocation of the license to operate which would be well nigh impossible to reinstate. To reinstate the license to operate these two chemical plants after closure would take two to three years and would require the creation of a gypsum stack at a cost of more than $3 million, a task clearly not within the capability of these Debtors.

This record leaves no doubt that none of these Debtors have any funds which are required to preserve the integrity of the two chemical plants and perform the functions necessary to prevent creation of environmental hazards and to fully comply with all regulations required by the environmental agencies involved. It is equally clear that these Debtors can only use cash collateral if this Court authorizes the sale of the phosphate rocks free and clear of liens. Hence comes the rub.

As noted earlier, in opposing the Motion to Use Cash Collateral, Agricole contends that this is not really a matter of use of cash collateral but an end run around Section 363(f) which governs the use, sale, or lease of property by the Debtor free and clear of liens.

Section 363(c)(1) provides if the business of a debtor is authorized to be operated pursuant to Section 1108, unless the Court orders otherwise, the trustee, i.e., the Debtor–in–Possession (DIP) may enter into transactions, including the sale of property of the estate in the ordinary course of business, without notice or a hearing.

Section 363(f) provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the state, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

From the foregoing it is evident that the proposal before this Court advanced by the Debtor cannot be approved if this Court determines that the proposed sale of the phosphate rocks is not in the ordinary course of business. This is so because none of the conditions for sale of free and clear interest required by 363(f) have been complied with. As a matter of fact, no motion was ever filed to sell properties free and clear of interest.

■ As described earlier, to view the proposed sale in a vacuum one might readily conclude this is a sale of capital assets and it is not a sale in the ordinary course of business. However viewing the totality of the picture, and the interdependence of these entities on each other and the completely integrated aspect of the economic life of these entities, it is clear that neither of the chemical plants can viably function as an independent economic unit, and are wholly dependent on the phosphate rocks to be furnished by Nu–Gulf mining operation, and indirectly also the continued exploration and mining of the Wingate property for phosphate rocks to be used by the two chemical plants.

The operation involved here is similar to coal mining operations where the mined coal is sold in the ordinary course of business it is not deemed to be a sale of capital assets out of the ordinary course of business, simply because that is the business of the mining company.

■ In sum this Court is satisfied that the unique and peculiar nature of the business purpose of these entities, at least at this point in time, warrants the conclusion that these sales are in the ordinary course of business governed by Section 363(c)(1) and not by Section 363(f). This leads to the ultimate question of whether or not the Debtor should be authorized to use the cash obtained from these sales once the sales are completed and the funds are received from the sales.

Section 363(c)(2) provides:

The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

Having concluded that the proposed sale is in the ordinary course of business and use of the funds are absolutely essential, at least temporarily to maintain the economic viability of these entities, the question is, how much is the bare basic minimum which is absolutely essential at the present time to temporarily accomplish this goal.

The proposed budget attached to the Motion to Use Cash Collateral is vague, unspecific and merely sets forth broad categories indicating the purpose of using the funds if the Motion is granted. For instance, the budget submitted proposes to use almost $1 million for the second half of February and the first half of March. The budget requests $121,421 for non-administrative payroll twice, for a total of $242,842.00 and administrative payroll of $90,336 twice for a total of $180,672. The budget is totally silent of any information which would indicate which of these expenditures are absolutely essential, especially the $180,672 as administrative payroll for Debtors. None of these Debtors operate any business in the conventional sense, do not engage in any phosphate processing operation, or generate any income, but merely intends to carry on maintenance of the two chemical plants to prevent the escape of toxic waste and pollution into the water supply in the relevant areas.

Based on the foregoing, this Court is satisfied that only the following expenditures are essential:

| | |
|---|---|
| Insurance | $ 120,000.00 |
| Electricity | $ 120,000.00 |
| Gyp–Stack Contractors | $ 60,000.00 |
| Outside Contractors | $ 10,000.00 |
| Equipment Rental | $ 25,000.00 |
| Maintenance Materials | $ 20,000.00 |
| General Supplies & Svcs | $ 30,000.00 |

This Court is cognizant of the fact that if the Debtors are authorized to use the sale proceeds derived from the sale of the phosphate rocks this would facially impair the interest of Agricole and other secured creditors who have a lien on the assets of Wingate and Nu–Gulf. Nevertheless, to enable the Debtors to find a very speedy solution to the extremely serious problems they face, this Court will reluctantly grant the Motion, albeit only to a limited extent. In the event that the Debtor is able to present competent evidence that Agricole, CIT and Maintenance and Machinery Erectors, Inc., are oversecured, the Court may reconsider to authorize the expenditure of additional funds if justified.

In light of the fact that these Chapter 11 cases are still in the embryonic stage and they are facing immediate doom unless they obtain some temporary relief de-

signed to prevent closing and terminating the chemical plant operations, it is proper to give a reasonable short period of time to attempt to salvage the values to all parties of interest by a sale of all the assets of these Debtors as one package.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Motion for Authority to Use Cash Collateral be, and the same is hereby granted and the Debtor is authorized to sell the phosphate rocks and expend the funds obtained from the sale only for the items specified above and the Motion as to the balance of the request is denied without prejudice.